Appeal of **HAGERSTOWN SHOE &            Docket No. 463.
LEGGING CO.**[1]

The taxpayer corporations were affiliated.

Submitted February 10, 1925; decided February 28, 1925.

*John F. McCarron, Esq.*, for the taxpayer.

*John D. Foley, Esq.* (Nelson T. Hartson, Solicitor of Internal Revenue) for the Commissioner.

Before JAMES, STERNHAGEN, TRAMMELL, and TRUSSELL.

### FINDINGS OF FACT.

The taxpayers are Maryland corporations with principal office at Hagerstown. The Hagerstown Shoe & Legging Co. (hereinafter called the Hagerstown Company) was organized in 1911. The Byron Shoe Manufacturing Co., Inc. (hereinafter called the Byron Company), was organized in 1919.

In 1911 five brothers, William C. Byron, Edward W. Byron, Harry W. Byron, Lewis T. Byron, and Joseph C. Byron, decided to go into the shoe business and organized the Hagerstown Company

---

[1] Byron Shoe Manufacturing Co., Inc., is also a party to this appeal.

to make leggings and stitch-down shoes. The stitch-down shoe is stitched up and down through the inner and outer soles, with the stitches showing on the outside. It is a seasonal article, which sells almost entirely in the spring, and the stock is accumulated from July until January, for sale the following spring. The manufacture of stitch-down shoes alone was uneconomical. Salesmen could not be kept on the road to handle only a one-season business. It was found expedient in 1919 to broaden the scope of the business and make the so-called McKay shoe, that could be sold all the year round, and for this purpose the Byron Company was organized and a new factory was constructed. As stated by the president at the hearing, "the business was not balanced, and we concluded then that we needed a branch, and we would manufacture the McKay shoe by the Byron Shoe Co." The Byron Company is colloquially called the McKay company and the McKay factory, and the Hagerstown Company is referred to as the legging company or the stitch-down factory. The Byrons looked upon the two companies as one "community of business," and in 1919 and 1920 the business of both corporations was conducted as a business unit. Lewis T. Byron was president of both, drawing his salary entirely from the Hagerstown Company, and at his death in 1922 was succeeded by Joseph C. Byron as president of both. L. V. Hershey was secretary of the Hagerstown Company and treasurer of the Byron Company, and is now secretary and treasurer of both companies, drawing two-thirds of his salary from the former and one-third from the latter company. "In order to tie the unit further together," the Hagerstown Company was the selling agent for the Byron Company,—" for the entire organization,"—and the salesmen sold for both companies. The Byrons fixed the percentage rate of compensation which the Hagerstown Company received for selling. It is an arbitrary figure. "Sometimes it works out and sometimes it doesn't. Sometimes they lose money and sometimes they do not. But the two companies are operated as one company under [the Byrons'] instructions."

At the time of the organization of the Hagerstown Company, in 1911, the Byrons furnished the capital. They took in other stockholders, all of whom were employed by the corporation in the factory, and furnished the money to enable them to acquire their stock. This was done from time to time after the organization of the corporation as to various employees. These employees in all instances gave identical notes to the Byrons for the future payment of the purchase price of the stock, secured by the stock as collateral, and the notes were to be paid out of the earnings as the company grew and became successful and paid dividends. This plan of stockholding by employees was also true of the Byron Company. The Byrons regarded themselves as having the right to control the entire business of both companies because they had furnished the capital. They therefore imposed restrictions upon the acquisition of stock by the employees, "so that the ownership of the company might not get out of the hands of the Byron family." Every acquisition of stock by persons other than the members of the Byron family was subject to conditions stated in the note, in the by-laws and stock certificate, and in an agreement with the Byrons for repurchase. These pro-

visions must be set forth verbatim.  The note for the payment of the purchase price of the stock:

$------------
Six months after date I promise to pay to the order of Edward W. Byron, Wm. C. Byron, Harry W. Byron, Lewis T. Byron and Joseph C. Byron _____ dollars, with interest at 5% per annum, for value received, having deposited as collateral security for the same, the following named securities:

_____ SHARES OF THE CAPITAL STOCK OF THE HAGERSTOWN SHOE & LEGGING COMPANY.

I agree that the above named securities, and any others added to or substituted for them, may be held as collateral security for all the obligations and liabilities of the undersigned, due the said Edward W. Byron, Wm. C. Byron, Harry W. Byron, Lewis T. Byron and Joseph C. Byron or to become due, or that may hereafter be contracted, I hereby authorize the said Edward W. Byron, Wm. C. Byron, Harry W. Byron, Lewis T. Byron and Joseph C. Byron to sell the collateral security either at private or public sale, at any time thereafter, without advertisement or notice to me, and with the right on the part of the said Edward W. Byron, Wm. C. Byron, Harry W. Byron, Lewis T. Byron and Joseph C. Byron to become purchasers thereof at such sale, freed and discharged of any equity of redemption, the proceeds to be applied to the payment of the above mentioned obligations and liabilities, together with all legal or other costs and expenses for collection of this note, or sale and delivery of the collateral, any excess or deficiency to be paid or received by me, as the case may be, and I further authorize the said Edward W. Byron, William C. Byron, Harry W. Byron, Lewis T. Byron and Joseph C. Byron to use, transfer, or hypothecate the collateral security, they being required, on payment or tender at maturity of the amount of the said obligations and liabilities, to return an equal amount of said securities, and not the specific securities pledged.

(Signed)    _____

The following provision in the by-laws is printed on the back of each stock certificate:

No stock of this corporation shall be issued or transferred to any person who is not an officer or a director of this corporation, except with the consent of the board of directors evidenced by a resolution duly passed at a regular meeting of the board, or at a special meeting called for that purpose, and every member who desires to sell his stock, and every member who for any reason shall cease to be an officer or director, his personal representatives, legatees or assigns, shall be required, at the time of the taking of the next inventory, as hereinafter provided for, to offer in writing to the board of directors to sell the number of shares of the capital stock held by him to such person or persons as the board of directors shall designate by a resolution duly passed, at and for the same sum per share, as is equaled by the quotient obtained by dividing the total net amount of said inventory by the number of shares then outstanding, and such member, his personal representatives, legatees or assigns, shall immediately, upon the payment or tender to him, in cash, of such price per share, transfer and assign the shares of the stock held by him to such person or persons so designated by the board of directors; in the event, however, that the board of directors shall refuse or neglect to designate such person or persons at the next regular meeting after such offer is made, or in the event of the refusal or neglect of such person or persons to pay or tender to such member the said price per share for each and every share held by such member within ten days after such designation and the completion of said inventory, then such member, his personal representatives, legatees or assigns, may hold the said shares of stock or sell and transfer the same to any person or persons to be held absolutely free from the conditions and restrictions contained therein.

Before the holder of the certificate for any shares of the capital stock who shall have obtained the same by bequest, or in the distribution of the estate of any member who may hereafter die, or by purchase at any sale made under an execution issued against any member or any legal process, or otherwise, shall be entitled to have the same transferred on the books of this corporation,

the said shares shall first be offered to and refused by such person or persons designated by the board of directors at the same price as above and subject to the same conditions.

No sale whatever of any shares of the capital stock shall pass any title thereto or be transferred on the books of this corporation, unless and until all the preceding conditions and requirements have been complied with, and no holder of any certificate of the same shall be entitled to any dividends thereon, or to share in any of the profits of this corporation until the shares are regularly transferred to him on the books of this corporation.

The typical agreement of Joseph C. and Lewis T. Byron with Roger Whipple, assuring the latter a purchaser for his stock, is as follows:

THIS AGREEMENT, made this 28 day of January, nineteen hundred and fourteen, by and between Lewis T. Byron and Joseph C. Byron, parties of the first part, and Roger Whipple party of the second part.

WITNESSETH:—That in consideration of the mutual covenants and agreements herein contained and in consideration of the said party of the second part subscribing to and paying for 320 shares of the capital stock of the HAGERSTOWN SHOE & LEGGING CO., a corporation duly incorporated under the laws of the State of Maryland, the said parties of the first part hereby covenant and agree to purchase from the said party of the second part the said 320 shares of the capital stock of the said corporation, provided the said parties of the first part are requested, in writing, so to do by the party of the second part, at the time of the taking of any inventory of the property, assets and liabilities of said corporation on the 1st day of January and the 1st day of July in each and every year, as provided for in the by-laws of said corporation, at and for the same sum per share as shall be equal to the quotient obtained by dividing the total net amount of said inventory by the number of shares of the capital stock of said corporation then outstanding and to pay for the same, in cash, within ten days after the completion of said inventory and the making of such request, in writing, by the said party of the second part.

And the said party of the second part hereby covenants and agrees that he will offer, in writing, to sell and sell to the said parties of the first part, their personal representatives or assigns, the said shares of stock and also all other shares of the capital stock of said corporation which he may hereafter acquire, at and for the price as above provided, before he offers to sell the same to any other person or persons, and further covenants and agrees, that in the event that he, the said party of the second part, shall at any time cease to be both an officer and director of said corporation, he will, at the time of the taking of the next inventory of the property assets and liabilities of said corporation thereafter, offer to sell and sell all his said stock of said corporation to the said parties of the first part, their personal representatives or assigns, at and for the same price ascertained, as above stated, such offer, in writing, and sale, however, to be subject to the approval of the board of directors of the said corporation, as provided for in said by-laws.

Witness our hands and seals.

LEWIS T. BYRON [SEAL]
JOSEPH C. BYRON [SEAL]
ROGER WHIPPLE [SEAL]

Witness
HARVEY H. HEYSER

The majority of the stock in both corporations was owned by the Byron brothers. William C. Byron died before the Byron Company was formed, and Lewis T. Byron died in 1922. All the outstanding stock not owned of record by the Byrons was held by persons who were officers and employees of the corporations. They all worked in the factories. When they ceased to be officers of the corporations they were compelled to sell their stock to the Byrons. "That," said the witness Byron, "is the way we kept the control."

The vice president connected with the sales department of the companies·went with the Hagerstown Company in 1913.  He bought stock under the arrangement above described with a full realization of the restrictions in the by-laws and the contract quoted above, and completed the payments on the notes in 1917.  He was not a stockholder of the Byron Company but was a director representing the Hagerstown Company, which owned 10 per cent of the Byron Company stock in 1919 and 20 per cent in 1920.  After the death of Lewis T. Byron in 1922 he acquired some stock in the Byron Company.

The employee stockholders voted their stock as the Byrons voted. They regarded their interests as identical with the Byron interests, and that the best interest of the corporations was their own best interest.  There was never any difference of opinion in the stockholders' and directors' meetings as to the best interests of the companies.  All the stockholders were in entire accord with the handling and management of the company at all times.  The employee stockholders did not feel strictly compelled to vote in accord with the Byrons, but they recognized that the Byrons were in control of the business through stockholdings and elections to the directorate.  We find the following, as testified by an employee stockholder without contradiction: " The junior members of this corporation have mostly worked with their sleeves rolled up.  The senior members of the corporation, as represented by the Byron brothers, have furnished the capital and done a great deal as to the general policies of the business.  My position as a junior called for my putting my best efforts for the good of the business.  I have never had any occasion to feel other than in accord with the business policy."  Another employee stockholder finished paying for his Hagerstown Company stock in 1919 and is still paying for his Byron Company stock.  Some of the employees did not finish paying until 1921 and 1922.

The stock ownership during the years in question is as follows:

|  | Hagerstown Company. | | Byron Company. | |
|---|---|---|---|---|
|  | Shares. | Per cent. | Shares. | Per cent. |
| **1919.** | | | | |
| E. W. Byron | 495 | 12. 2 | 125 | 12. 5 |
| J. C. Byron | 550 | 13. 8 | 124 | 12. 4 |
| L. T. Byron | 550 | 13. 8 | 325 | 32. 5 |
| H. W. Byron | 550 | 13. 8 | 125 | 12. 5 |
| L. V. Hershey | 100 | 2. 5 | 100 | 10 |
| Totals | 2, 245 | 56. 1 | 799 | 79. 9 |
| R. L. Campbell | 400 | 10 | | |
| H. H. Heyser | 500 | 12. 6 | | |
| J. F. Fechtig | 400 | 10 | | |
| Roger Whipple | 400 | 10 | | |
| R. C. Hershey | | | 100 | 10 |
| W. D. Byron | | | 1 | .1 |
| W. H. Byron | 55 | 1. 3 | | |
| Hagerstown Company | | | 100 | 10 |
| Totals | 1, 755 | 43. 9 | 201 | 20. 1 |
| Grand totals | 4, 000 | 100 | 1, 000 | 100 |

|  | Hagerstown Company. | | Byron Company. | |
|---|---|---|---|---|
|  | Shares. | Per cent. | Shares. | Per cent |
| **1920.** | | | | |
| E. W. Byron | 495 | 12.2 | 125 | 12.5 |
| J. C. Byron | 550 | 13.8 | 125 | 12.5 |
| L. T. Byron | 550 | 13.8 | 250 | 25 |
| H. W. Byron | 550 | 13.8 | 125 | 12.5 |
| L. V. Hershey | 100 | 2.5 | 125 | 12.5 |
| Totals | 2,245 | 56.1 | 750 | 75 |
| R. L. Campbell | 400 | 10 | | |
| H. H. Heyser | 500 | 12.6 | | |
| J. F. Fechtig | 400 | 10 | | |
| Roger Whipple | 400 | 10 | | |
| W. H. Byron | 55 | 1.3 | | |
| Hagerstown Company | | | 200 | 20 |
| L. T. Byron, jr | | | 50 | 5 |
| Totals | 1,755 | 43.9 | 250 | 25 |
| Grand totals | 4,000 | 100 | 1,000 | 100 |

The Commissioner determined a deficiency for the calendar years 1919 and 1920 of $52,388.26, of which he duly notified the taxpayer on August 29, 1924.

### DECISION.

The Hagerstown Shoe & Legging Co. and the Byron Shoe Manufacturing Co., Inc., were affiliated in the calendar years 1919 and 1920, and their lability should be determined on the basis of a consolidated return. The tax should be recomputed and final decision will be made on stipulation or on seven days' notice, in accordance with Rule 50.

### OPINION.

STERNHAGEN: We are to consider whether the foregoing facts combine into a situation where two corporations are affiliated so as to make the determination of their tax liability a single rather than a multiple problem. Clearly there is a commercial and economic unity in the enterprise. Probably for no other practical purpose would one consider the production of income by these two factories as a double function. Their owners and employees consider them a business unit, and the interest of each is the interest of all. The Byron Company was conceived in the necessities and inadequacy of the older company, and was deliberately created as a branch and supplement to supply its patent need. If personnel and legal structure be disregarded the evidence leads unswervingly to the conclusion of a single united enterprise. Why the Byron Company was separately created does not appear, and we shall not speculate on its reason. For aught the evidence discloses its whole function could as well have been performed as an arm of the Hagerstown Company.

The Byron brothers are the dominating and guiding spirit of the business. They originated it and formed the Hagerstown Company, which they alone financed. They operated the business and so completely controlled it that no one else questioned their management. They determined the extent of outside stock ownership and

its tenure, and by unequivocal written agreements they forestalled any opposition through discontentment. At no time had they less than a voting majority in absolute ownership or, we are satisfied, less than an irresistible influence over the whole. The president expressed the situation by calling the employees' stock ownership a plan of profit sharing. One needs only to read the written terms of the note, the by-laws, and the agreement, carefully drawn and fully comprehended by the stockholders, to see that the tiller is always in the firm grasp of the Byron family. Theirs is the last and controlling word, however freely they may invite suggestion. The oarsman who at any moment may be cast overboard is no more free because he pulls an ardent stroke.

Does it matter that most of the employees' stock was paid for so that title was freed from the pledge for the note? This was not ownership, for the power of free disposition, that sine qua non of ownership, was wholly wanting. The stockholder could only vote and share the profit. Indeed, his vote was futile unless in accord with the Byrons. And his ownership carried no responsibility, for in case of loss he had only to quit by selling his stock to the Byrons under his contract.

Are we, in applying this statute, to look at the tabulated statement of stock ownership and, because it there appears that several persons are stockholders of one or the other legal entity and not of both, say that this alone is determinative? We have had occasion in other appeals on other questions to say, and we can not too often repeat, that *all* facts must be considered. These problems are not flat mathematical or legalistic puzzles; they are vital, and must be examined in three dimensions with the light of reality. No solution otherwise arrived at could long survive. Here the table of percentages changes its color entirely in the light of the circumstances under which the percentage distribution exists, and, instead of indicating a substantial independent minority, indicates that "substantially all the stock of two * * * corporations is owned or controlled by the same interests."